UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TOLOWA NATION,

           Plaintiff,

    v.

UNITED STATES OF AMERICA, et al.,

           Defendants.

Case No.  17-cv-06478-RS

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S CROSS
MOTION**

## I.  INTRODUCTION

Plaintiff Indian tribe, the Tolowa Nation ("Nation"), brings suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, against the United States of America, the United States Bureau of Indian Affairs, the Secretary of the Interior, and the Assistant Secretary of the Interior for Indian Affairs (collectively the "Department of the Interior" or "DOI") for DOI's rejection of the Nation's application for federal recognition as a sovereign Indian tribe.  Only one criterion of the DOI's review process is at issue: whether the Nation demonstrated that "[a] predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present."  25 C.F.R. § 83.7(b).  DOI concluded the Nation submitted insufficient evidence to satisfy this criterion.

The Nation challenges DOI's final determination in two ways: (1) DOI failed to review the application under the correct evidentiary standard, thus constituting an agency action "without observance of procedure required by law" under APA section 706(2)(D); and (2) DOI's determination that the Nation is not a distinct community is contrary to the record before it and

therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under APA section 706(2)(A).  The Nation moves for summary judgment setting aside DOI's determination.  Additionally, the Nation seeks declaratory relief in the form of a judicial declaration as to federal recognition of the Tolowa Nation as an Indian tribe.  DOI cross-moves for summary judgment affirming its decision.  Because DOI has shown its determination did not violate the APA, its motion will be granted and the Nation's motion will be denied.

## II.  BACKGROUND[1]

In 1851, the federal government identified a number of Indian villages in Del Norte County, California, that were linguistically distinct from surrounding tribes.  Located along the Smith River and Lake Earl, the Indians in these villages spoke an Athabascan dialect, and were collectively referred to as Tolowa by other local tribes.  In 1853, with the incorporation of Crescent City, California, first sustained contact between the federal government and the Tolowa villages began.  Between 1855 and 1861, the federal government attempted to remove the Tolowa located at the mouth of the Smith River to the Klamath reservation.  From the 1860s to the turn of the 20th century, the Tolowa lived mainly in their historical villages.  In 1906 and 1908, Congress appropriated money for the purchase of lands for Northern California Indians, which lead to the establishment of the Smith River Rancheria and the Elk Valley Rancheria.  *See* Indian Appropriation Act of 1906, 34 Stat. 325, 333; Indian Appropriation Act of 1908, 35 Stat. 70, 76-77.  These rancherias are currently federally recognized tribes.

The Nation maintains that its ancestors are drawn from those Tolowa who did not join the rancherias.  Instead, the Nation asserts it emerged from the community of Tolowa villages around the Smith River and the lagoon called Lake Earl, from pre-contact time through the destruction of those villages in the mid-1800s, when Tolowa survivors took refuge around the village of Etchulet.  The Nation contends some Tolowa remained after Etchulet was attacked and those survivors are the ancestors of the Nation now seeking recognition.  The Nation distinguishes

---

[1] This synopsis is based on the joint appendix ("J.A.").

between two groups of Tolowa, the "river Indians," who the Nation states were primarily landless, and the "lake Indians," who it characterized as living independently around the lagoons of Lake Earl and Lake Tolowa.  The Nation argues these landless Indians were the focus of federal land acquisition resulting in the establishment of the Smith River and Elk Valley rancherias, while the "lake" Tolowa, who had lived in the environs of Etchulet and Crescent City, owned their own property and maintained a separate community.  The Nation further asserts its members have sustained their community through the Del Norte Indian Welfare Association ("DNIWA").  Allegedly established in 1928, the Nation contends DNIWA provided the formal organization and leadership for the Nation both when the rancherias were unorganized as tribal governments and during the time the rancherias' federal recognition as Indian tribes was terminated between 1966 and 1983.  The Nation alleges its members therefore comprise a separate and distinct community entitled to federal recognition.

In 1982, the Nation (proceeding under the name "Tolowa-Tututni Tribe of Indians") submitted its petition for federal recognition to the DOI.  The petition was placed on the list of petitions ready for active consideration in 1996.  In 2009, the petition was placed on active consideration.  In 2010, the DOI issued the "Summary under the Criteria and Evidence for the Proposed Finding against Acknowledgement of the Tolowa Nation" ("Proposed Finding").  A notice of the Proposed Finding and request for comments was published in the Federal Register.  75 Fed. Reg. 71732, 71732-33 (Nov. 24, 2010).  In January 2014, the DOI published a Notice of Final Determination without a separate report or other summary.  79 Fed. Reg. 4953, 4953-55 (Jan. 30, 2014).  The Notice stated the comments and documents submitted in response to the Proposed Finding did "not provide evidence that changes the analysis or conclusions in the [Proposed Finding] that the petitioner's ancestors did not form a distinct community," and incorporated the reasoning of the Proposed Finding.  *Id.* at 4954.[2]  The Nation appealed the DOI's

---

[2] Since the Final Determination incorporated the reasoning of the Proposed Finding without a separate report or other summary, the case is focused on the DOI's analysis in the Proposed Finding, even though the Final Determination is technically the final agency action under review.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
CASE NO. 17-cv-06478-RS

United States District Court
Northern District of California

1    Final Determination to the Interior Board of Indian Appeals, which affirmed the DOI in 2016.

2    The Nation now seeks judicial review of the DOI's Final Determination under the APA.

3    ### III.  LEGAL STANDARD

4    Although the parties characterize their briefing as constituting cross-motions for "summary

5    judgment," this is not an inquiry under Rule 56 of the Federal Rules of Civil Procedure as to

6    whether there are disputed factual issues for trial.  Rather, this is the review on the merits under

7    the APA of the validity of the denial of federal recognition as an Indian tribe.  *See Klamath*

8    *Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013); *see also*

9    *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007) (judicial review of agency

10   action under the APA limited to the administrative record); *Sierra Club v. Mainella*, 459 F. Supp.

11   2d 76, 89 (D.D.C. 2006) ("[T]he standard set forth in Rule 56(C) does not apply [in an APA case]

12   because of the limited role of a court in reviewing the administrative record.").

13   "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision

14   that is supported by the administrative record, whereas 'the function of the district court is to

15   determine whether or not as a matter of law the evidence in the administrative record permitted the

16   agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental*

17   *Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)).  In other words, "the district court acts

18   like an appellate court, and the 'entire case' is 'a question of law.'" *Nat'l Law Ctr. on*

19   *Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C.

20   2012) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

21   "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the

22   agency action is supported by the administrative record and otherwise consistent with the APA

23   standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C.

24   2007).

25   In the Complaint, the Nation asserts three claims for relief: (1) the DOI violated 5 U.S.C.

26   § 706(2)(D) in failing to review the Nation's application under the correct evidentiary standard

27   when it required evidence beyond the "reasonable" standard called for in the regulations; (2) the

28

United States District Court
Northern District of California

1    DOI violated 5 U.S.C. § 706(2)(A) in concluding the Nation failed to demonstrate it was a

2    separate and distinct community from the neighboring federally recognized Indian rancherias; and

3    (3) a claim for declaratory relief, seeking a judicial declaration as to federal recognition of the

4    Tolowa Nation as an Indian tribe.

5            Under the APA, a court may set aside an agency's final action if the action was "arbitrary,

6    capricious, an abuse of discretion, or otherwise not in accordance with law," or if it is taken

7    "without observance of procedure required by law." § 706(2)(A), (D); *accord Kern Cty. Farm*

8    *Bureau v. Allen*, 450 F.3d 1072, 1075-76 (9th Cir. 2006). The arbitrary and capricious standard is

9    "highly deferential, presuming the agency action to be valid and [requires] affirming the agency

10   action if a reasonable basis exists for its decision." *Kern*, 450 F.3d at 1076 (quotation omitted).

11   Under such deferential review, a court is not to substitute its own judgment for that of the agency.

12   *Id.* An agency rule is arbitrary and capricious when the agency "has relied on factors which

13   Congress has not intended it to consider," "entirely failed to consider an important aspect of the

14   problem," "offered an explanation for its decision that runs counter to the evidence before the

15   agency," "or is so implausible that it could not be ascribed to a difference in view or the product of

16   agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

17   (1983). Unlike substantive challenges, "review of an agency's procedural compliance is exacting,

18   yet limited." *Kern*, 450 F.3d at 1176. The reviewing court is limited to ensuring that "statutorily

19   prescribed procedures have been followed." *Id.* (quotation omitted).

## IV.  DISCUSSION

### A.  Part 83 Process for Recognition

22          Federal recognition is a prerequisite to the receipt of various services and benefits available

23   only to sovereign Indian tribes. 25 C.F.R. § 83.2. Political recognition of a tribe by the federal

24   government establishes a unique government-to-government relationship between the tribal

25   government and the United States and acknowledges the tribe's inherent sovereign authority over

26   its affairs. *See* Barbara N. Coen, *Tribal Status Decision Making: A Federal Perspective on*

27   *Acknowledgment*, 37 New. Eng. L. Rev. 491, 491-92 (2003) (summarizing the benefits of

28

United States District Court
Northern District of California

sovereignty and applicable statutes).  Pursuant to its plenary power over Indian affairs, Congress

has the ultimate authority to recognize an Indian tribe.  *See, e.g.*, U.S. Const. art. I, § 8, cl. 3

(empowering Congress "[t]o regulate Commerce . . . with the Indian tribes"); *Cotton Petroleum

Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) ("[T]he central function of the Indian Commerce

Clause is to provide Congress with plenary power to legislate in the field of Indian affairs[.]").  In

1978, pursuant to broad authority delegated by Congress, see 25 U.S.C. §§ 2, 9, DOI promulgated

regulations establishing a formal recognition procedure, the Part 83 process, for nonrecognized

tribes.  *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 211 (D.C. Cir. 2013); *see* 25 C.F.R.

§§ 83.1–83.13.[3]  The Part 83 process is "intended to apply to groups that can establish a

substantially continuous tribal existence and which have functioned as autonomous entities

throughout history until the present."  § 83.3(a).  It is available to nonrecognized tribes that are not

"already acknowledged" or "receiving services from the Bureau of Indian Affairs."  § 83.3(b).[4]

To be recognized under the Part 83 process, the petitioning tribe "must satisfy" seven

criteria by submitting "thorough explanations and supporting documentation."  § 83.6(c); *see*

§ 83.7(a)–(g) (delineating the criteria).  The burden of providing sufficient evidence under the

criteria in the regulations rests with the petitioning tribe.  §§ 83.5(c), 83.6(c), 83.7(b)(2).  The

petitioning tribe must show that "available evidence establishes a reasonable likelihood of the

validity of the facts relating to [each] criterion" but conclusive proof is not required.  § 83.6(d).

DOI must "take into account historical situations and time periods for which evidence is

demonstrably limited or not available."  § 83.6(e).

After DOI receives a petition, the initial determination for federal recognition is made by

the Office of Federal Acknowledgement ("OFA"), located within the Bureau of Indian Affairs

---

[3] In 2015, the regulations governing the Part 83 process were revised, effective July 31, 2015.  *See* 80 Fed. Reg. 37862 (July 1, 2015).  The Final Determination was issued under the previous regulations.  The discussion therefore cites to the 2014 edition of the regulations.

[4] Other means of recognition include congressional legislation and federal court order.  *See* Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(3), 108 Stat. 4791 (codified at 25 U.S.C. § 479a-1).

United States District Court
Northern District of California

1    ("BIA"), which the Assistant Secretary for Indian Affairs reviews and then issues a "proposed

2    finding." § 83.10(h).  The petitioning tribe may respond, submit additional documentation, and

3    request an on-the-record meeting with the Assistant Secretary.  § 83.10(i)–(k).  After review, the

4    Assistant Secretary issues a "final determination" that either recognizes the petitioning tribe as an

5    Indian tribe or denies the petition.  § 83.10(l)(2).  Appeals are heard by the Interior Board of

6    Indian Appeals.  § 83.11(a)(1).  DOI's decision to grant or deny a group's application can be

7    challenged in federal court if it is filed within six years of the final agency decision.  28 U.S.C.

8    § 2401(a).

9         Only one criterion was decided by the DOI and is at issue in this case: the petition must

10   establish that a "predominant portion of the petitioning group comprises a distinct community and

11   has existed as a community from historical times until the present." § 83.7(b).[5]  "Community" is

12   defined by the regulations as "[a]ny group of people which can demonstrate that consistent

13   interactions and significant social relationships exist *within its membership* and that *its members*

14   *are differentiated from and identified as distinct from nonmembers*.  Community must be

15   understood in the context of the history, geography, culture and social organization of the group."

16   § 83.1 (emphasis added).  "Continuously" or "continuous" means "extending from first sustained

17   contact with non-Indians throughout the group's history to the present substantially without

18   interruption."  *Id.*  Examples of forms of evidence that in combination may satisfy the criterion at

19   section 83.7(b) include significant rates of marriage within the group, significant social

20   relationships connecting individual members, and significant rates of informal social interaction

21   broadly among the members of the group.  § 83.7(b)(1).  Other evidence is sufficient in itself to

22   demonstrate community for a given time period, such as 50% of the members residing in a

23   geographic concentration within an area exclusively or almost exclusively composed of members

24

25   _____

26   [5] The Proposed Finding also determined that the Nation did not qualify for the relaxed criteria for
recognition under section 83.8, as it could not demonstrate it had unambiguous previous federal

27   acknowledgment as an Indian tribe. (J.A. at 708-11.)  The Nation does not challenge this agency
determination.

28

United States District Court
Northern District of California

1   of the group, or 50% of the members maintaining distinct cultural patterns, such as language or

2   kinship organization.  § 83.7(b)(2).

3       **B.  Improper Procedure Under § 706(2)(D)**

4       The Nation argues the DOI failed to review the Nation's application under the proper

5   procedures in violation of § 706(2)(D).  It supports this argument by alleging the DOI failed to

6   follow section 83.6(d), which states a criterion shall be considered met if "the available evidence

7   establishes a reasonable likelihood of the validity of the facts relating to that criterion."  § 83.6(d).

8   Further, "[c]onclusive proof of the facts relating to a criterion" is not required to satisfy a criterion.

9   *Id.*  In the Nation's view, the DOI used a sufficiency standard whereby it based its decision on the

10  lack of evidence without weighing the available evidence to establish the reasonable likelihood of

11  any facts.  The Nation further contends it is not its burden to provide sufficient evidence, and that

12  DOI is required to consider all available evidence to determine whether in total it establishes a

13  reasonable likelihood of the validity of the facts relating to the Nation's continuous existence.  The

14  Nation concludes the evidence provided by it, or its failure to provide any, cannot be the basis for

15  the DOI's denial of recognition.

16      It is difficult to follow the Nation's argument regarding procedural defects in the DOI's

17  decision.  Nonetheless, the regulations provide a ready answer.  Numerous sections place the

18  burden of production on the petitioning tribe.  Section 83.5(c) states the DOI "shall not be

19  responsible for the actual research on behalf of the petitioner."  Section 83.6(c) declares the

20  petition "must include thorough explanations and supporting documentation in response to all of

21  the criteria."  Section 83.7(b)(2) instructs a petitioner "shall be considered to have *provided*

22  *sufficient evidence* of community at a given point in time if evidence is provided to demonstrate

23  any one of the following[.]"  (emphasis added).  The DOI may be required to review all available

24  evidence, but it is the Nation's burden of production in the first instance.  Further, the regulations

25  permit the DOI to deny a petition "if there is insufficient evidence that it meets one or more of the

26  criteria."  § 83.6(d).  Thus, the regulations require the DOI to determine whether evidence in the

27  record is sufficient or insufficient to establish whether a criterion has been met.  The "reasonable

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  likelihood" standard applies by its terms to establishing the validity of individual facts, not to the

2  overall burden of proof.  The Nation mistakenly believes its burden is to show only that a

3  "reasonable basis" exists to conclude it meets the criterion.  The correct standard is whether the

4  record as a whole contains sufficient evidence to satisfy the criterion at section 83.7(b).

5       The Nation makes two other arguments that bleed into its arbitrary and capricious claim.

6  They are discussed in more detail below.  For purposes of section 702(2)(D), the Nation contends:

7  (1) the DOI failed to accord the evidence its proper weight when it resolved all doubts against the

8  Nation's petition and evaluated (and discounted) each piece of evidence standing alone, without

9  considering the record as a whole, effectively requiring conclusive evidence in violation of section

10  83.6(d); and (2) the DOI's imposition on the Nation to demonstrate it was not part of the

11  neighboring rancherias was outside of the regulations' procedural requirements and that evidence

12  of continuous existence was all that was required.  As to the first argument, the Nation failed to

13  provide evidence of social exclusivity to define its ancestors and its current members from

14  nonmembers between 1853 and the present, such that no reading of the combined evidence can

15  satisfy the criterion at section 83.7(b).  As to the second argument, the criterion requires the DOI

16  to determine if "a predominant portion of the petitioning group comprises a *distinct* community . .

17  . ." § 83.7(b) (emphasis added).  It was therefore appropriate for the DOI to require the Nation to

18  submit evidence distinguishing its community from the neighboring rancherias.[6]

19      **C. Arbitrary and Capricious Under § 706(2)(A)**

20      The bulk of the Nation's motion centers on its contention that the DOI's determination

21  violates section 706(2)(A) of the APA as agency action that is arbitrary, capricious, an abuse of

22  discretion, or otherwise contrary to law.  The Nation argues the DOI's determination that the

23

24  [6] The Nation makes a passing argument that the DOI's request in the Proposed Finding for further
25  documentation clarifying DNIWA's status after 1928, (J.A. at 723), exceeded the standard
required by the regulations.  The regulations say otherwise.  During the response period after the
26  Assistant Secretary publishes the Proposed Finding, the Assistant Secretary "shall provide . . .
suggestions regarding the preparation of materials in response to the proposed finding."
27  § 83.10(j)(1).

28  ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
CASE NO. 17-cv-06478-RS

9

1    Tolowa Nation is not a distinct community under section 83.7(b) is contrary to the evidence in the

2    record.  In the Nation's opinion, placing the burden on the Nation to distinguish itself from the

3    Smith River and Elk Valley rancherias ignores the continuous history of the non-rancheria Tolowa

4    during the period the federal government established the rancherias.  Moreover, the nation repeats

5    its argument that the DOI reviewed evidence in isolation without properly considering the whole

6    record.

7            The DOI considered evidence of community development and interaction during six

8    specific time periods, beginning with first sustained contact with the Tolowa in 1853, and lasting

9    through the inception of the acknowledgement process to the present (2010, when the Proposed

10   Finding was published).  (J.A. at 712.)  These time intervals are marked by events that affected the

11   Tolowa people in Del Norte County dramatically or that provide important context for

12   understanding the evidence used in the DOI's Proposed Finding.  (*Id.*)  They are: (i) 1853 to 1868;

13   (ii) 1869 to 1899; (iii) 1900 to 1933; (iv) 1934 to 1949; (v) 1950 to 1982; and (vi) 1983 to present.

14   (*Id.*)  Ultimately, the DOI concluded the evidence was "insufficient to show either that Petitioner

15   [] existed as a distinct continuous community from 1853 to the present, that it evolved from the

16   villages or settlements from 1869–1900, or evolved as a distinct community from the Elk Valley

17   or Smith River Rancherias that formed between 1906 and 1915." (*Id.*)  In particular, the DOI

18   found the Nation had not proven "consistent interactions and significant social relationship[s]

19   within its membership and that its members are differentiated from, and identified as distinct from,

20   nonmembers." (J.A. at 732-33.)  The Nation challenges several aspects of the DOI's

21   determination, none of which are persuasive.

22           The DOI concluded that, prior to the formation of the rancherias, the evidence does not

23   show the Nation's ancestors existed as a community distinct from the ancestors of the Smith River

24   or Elk Valley rancherias.  (J.A. at 734.)  According to the Proposed Finding, the key problems

25   with evidence for this time period are the lack of contemporary documentation naming individuals

26   who could be identified as ancestors of the Nation or linking ancestors who could be named to

27   social interactions that were exclusive from other Tolowas in the region.  (J.A. at 712, 716.)  The

28

United States District Court
Northern District of California

1   Nation highlights the DOI's finding that Tolowa Indians in Del Norte County remained in the

2   villages around Smith River, Crescent City, and Lake Earl "living in their traditional villages

3   throughout this period." (J.A. at 714; *see also* J.A. at 716.)  In the Nation's opinion, this

4   demonstrates the separate existence of the Tolowa that lived in each of these locations: the Lake

5   Earl Tolowa developing into the Nation, while the rest evolved into the rancherias.  The DOI

6   determined, however, that there was insufficient information either connecting the Indians at these

7   villages to the Nation, or to infer any social interactions or customs between them that were

8   *exclusive* from other Tolowas in the region.  (J.A. at 714-716.)  This evidence only confirms the

9   presence of Tolowa Indians in the region, not distinguishable bands that identified themselves as

10   distinct from the others.

11      Indeed, the DOI does not dispute that Tolowa Indians have been present in Del Norte

12   County from the time of sustained first contact to the present.  That fact alone, however, does not

13   show that the Nation existed as a *distinct community* differentiated from others.  *See* § 83.1

14   (defining "community").  The Nation must do more than merely show the general existence of

15   Tolowa people in the relevant geographic area; rather, it must provide sufficient evidence to

16   demonstrate that it existed as a distinct community.  The criterion calls for a showing that "the

17   petitioning group . . . has existed as a community from historical times."  § 83.7(b).  Therefore,

18   even giving the Nation the broadest inference from the record that more of the Tolowa Indians

19   living prior to the formation of the rancherias were ancestors of modern-day members than those

20   who were identified, that is not enough to infer "consistent interactions and significant social

21   relationships" among those ancestors, nor is it enough to infer that their location in a separate

22   village differentiated their membership from Tolowa Indians in other villages.  *See* § 83.1.  The

23   DOI had proper grounds to find insufficient evidence distinguishing the Nation's community from

24   the other Tolowa during this time period.

25      The DOI further determined the evidence did not show that the Nation's ancestors evolved

26   as a distinct community after the rancherias were formed.  (J.A. at 734.)  Although the DOI found

27   evidence identifying ancestors of the Nation's modern-day members, there was again nothing to

28

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
CASE NO. 17-cv-06478-RS

United States District Court
Northern District of California

1   infer they had formed a separate community from the Tolowa who were members of the

2   rancherias.  (J.A. 718-19.)  The Nation argues its direct ancestors did not enroll with the rancherias

3   when they were formed because they already owned their own land.  DOI conducted an analysis to

4   test the veracity of such claims and determined the evidence was insufficient to show the existence

5   or evolution of a community that was distinct from the rancherias.  (*Id.*)  The Proposed Finding

6   analyzed the varying land statuses of the Nation's ancestors, but concluded it was not clear

7   whether, or how, such land status may have affected possible social interaction.  (J.A. at 719.)

8   While land status may have differentiated these families in some way from the rancherias'

9   families, such evidence was insufficient on its own to show the existence or evolution of an Indian

10   tribal community distinct from the rancherias during this time period.  (*Id.*)  Once again, the

11   analysis turns on the Nation's lack of evidence of how its ancestors were distinguished *socially*, as

12   opposed to geographically, from the rancherias.[7]

13          The Nation further challenges DOI's analysis regarding DNIWA.  DOI concluded this

14   organization, claimed by the Nation as its precursor, did not function as a distinct community at

15   any point in time.  (J.A. at 734.)  This was for two reasons: (1) its membership was not exclusive

16   to the Nation's ancestors, but also included members of the rancherias; (2) available evidence

17   showed that the members of both DNIWA and the rancherias considered DNIWA as an

18   organization whose advocacy role differed clearly from the evolving governing councils at Smith

19   River and Elk Valley rancherias.  (J.A. at 723, 727.)  The first point continues the theme of the

20   need for some form of social exclusion of outsiders in order to define a community that is distinct

21   from nonmembers.  The Nation's ancestors were the most involved with DNIWA, but they did so

22   in conjunction with a significant number of persons from the two rancherias.  (J.A. at 724.)  The

23

24   [7] The Nation also takes issue with what it perceives as the DOI's improper application of a
     "heredity requirement" when "continuity of membership" is not a requirement under the
25   regulations.  (Pl. Reply at 8.)  When evaluating if a petitioner meets the criterion at section
     83.7(b), however, the DOI evaluates whether ancestors of current members formed a community.
26   If the current members do not descend from individuals who were part of a community previously,
     then the petitioner could not evolve from nor be a continuation of that community.  (*See* J.A. at
27   704, 710, 712, 733-34.)

28                                                        ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
                                                          CASE NO.  17-cv-06478-RS

United States District Court
Northern District of California

1    evidence of informal social interactions between the Nation's ancestors and the rancherias'

2    members also failed to suggest the existence or evolution of a community distinct from these

3    rancherias.  Moreover, there was no evidence to suggest if and how DNIWA functioned as a

4    community that included a *predominant* portion of the Nation's membership.  (J.A. at 733-34.)

5         The second point is defined by the actions of both the DOI and the rancherias prior to the

6    termination of federal recognition of the rancherias.  Although DNIWA offered to represent the

7    rancherias during the termination planning process, the DOI declined in 1952, opting instead to

8    work directly with the rancherias.  (J.A. at 724.)  The DOI then proceeded to establish organized

9    governing bodies at each rancheria (which until this point had an unorganized governing

10   structure), and deemed DNIWA an advocacy organization, not an Indian tribal entity.  (*Id.*)

11   DNIWA members took efforts to distinguish the rancherias' governing councils from DNIWA

12   regarding political influence.  (J.A. at 725-26.)  The Nation argues this is evidence of the distinct

13   community DNIWA formed for the Nation, but instead this shows that DNIWA members

14   considered the roles of the rancherias' councils to be separate from DNIWA's advocacy efforts to

15   revitalize Tolowa culture.  (J.A. at 727.)

16        Similarly, the Nation argues the DOI's determination ignored Guschu Hall, a building

17   owned and operated by the Nation as the center of its culture and governance.  The DOI's motion

18   papers and the Proposed Finding say little regarding Guschu Hall.  (*See* J.A. at 724, 732.)  The

19   Nation, however, does not suggest any purpose the building is used for that is exclusive to the

20   Nation.  (*See* J.A. 682-83 (Board of Indian Appeals finding same).)   Without such evidence, there

21   is no reason to displace the DOI's decision.

22        As a corollary argument, the Nation criticizes DOI's recognition of the rancherias as Indian

23   tribes, contending they are effectively artificial constructs of the DOI as opposed to natural Indian

24   tribal entities.  Yet it is Congress that has the plenary power to authorize such recognition.

25   Additionally, the Nation contends that DNIWA was the only formal Tolowa entity after the Elk

26   Valley's termination in 1966 and the Smith River's termination in 1967.  (J.A. at 710 n.10.)  Until

27   their restoration in 1983, (*id.*), the Nation asserts its ancestors' involvement in DNIWA constituted

28

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
CASE NO. 17-cv-06478-RS

1     the continuation of the Tolowa community and inherently distinct from the rancherias, which were

2     no longer Indian tribal entities in the eyes of the law.  The rancherias' termination, however,

3     cannot establish the Nation as a distinct community because DNIWA membership, as noted, was

4     not exclusive to the Nation's ancestors.

5              The Nation next challenges the DOI's determination that the evidence fails to show the

6     Nation's membership functioning as a community from 1980 to the present.  (J.A. at 734).  This is

7     due mainly to the Nation's high turnover rate in membership over a short period.  In the original

8     1983 membership roll, there were 130 total members.  (J.A. at 705.)  In 1986, there were 338

9     people listed.  (J.A. at 731.)  By 1996, only 166 were on the membership roll, sharing only 94 in

10    common with the 1986 roll.  (J.A. at 705, 731.)  Although several individuals left to join the Smith

11    River Rancheria when it opened its membership between 1991 and 1996, that number only

12    amounted to 68 people.  (*Id.*)  Accounting for individuals who may have been dually enrolled by

13    1996, or were accepted into Smith River sometime between 1996 and 2008, still leaves at least

14    one-third of the Nation's membership becoming lost for reasons unrelated to decisions to join

15    Smith River.  (*Id.*)  Moreover, over 40% of the 1996 list was not previously recorded in the 1986

16    list.  (*Id.*)  The DOI concluded that the high turnover between the two lists over a ten-year period

17    suggests the Nation recruited members who appeared to manifest little commitment or connection

18    to it.  (*Id.*)  After 1996, the membership numbers continued to drop, declining to 102 individuals,

19    77 of which were in common between the 2009 roll and the 1996 roll.  (J.A. at 705, 731.)  As of

20    the date of the Proposed Finding, 88 members were known to be current, living members.  (J.A. at

21    705.)  The Nation counters that changes in membership are inevitable over a 30-year time span.

22    Such dramatic changes in a short period of time, however, warrants giving deference to the DOI's

23    conclusion absent contrary evidence that was not considered in the Proposed Finding.  The Nation

24    does not identify any such evidence.

25             Finally, the Nation argues that in assuming the rancherias were the only manifestations of

26    the Tolowa people, the DOI took evidence in isolation without properly considering the whole

27    record.  According to the Nation, the DOI fails to appreciate that the Nation applied for

28

1  recognition before the reinstatement of federal recognition of the rancherias.  The Nation further
2  accuses the DOI of ignoring evidence of the Nation's membership being comprised of Tolowa
3  who were never part of the rancherias.  Moreover, the Nation asserts it has never staked its claim
4  for recognition on descending from a single unified community from which the rancherias split
5  off.  In its view, the DOI's decision fails to consider that the Tolowa people consisted of
6  autonomous village tribelets, and the Tolowa Nation arose from bands distinct from the Smith
7  River rancheria band.  Without evidence of social exclusivity to define the Nation's ancestors and
8  its current members from nonmembers between 1853 and the present, however, no reading of the
9  combined evidence can save the Nation's petition.  Furthermore, the Proposed Finding showcases
10 the DOI's thorough treatment of the application and consideration of the record as a whole,
11 including those individuals who were not members of the rancherias, but whose social interactions
12 failed to demonstrate a level of exclusivity to define themselves as a distinct community under the
13 regulations.

### V.  CONCLUSION

The DOI's motion is granted, and the Nation's motion is denied.  Since there is no reason
to disturb the DOI's findings, it is not appropriate to grant federal recognition of the Tolowa
Nation on this record.  Congress of course retains the authority to use its plenary power to pass
legislation recognizing the Tolowa Nation as an Indian tribe should it vote to do so.

**IT IS SO ORDERED**.

Dated: March 12, 2019

_____
RICHARD SEEBORG
United States District Judge

United States District Court
Northern District of California